IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
02 MAR 21 PM 2:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use of UTILITY SERVICE CORPORATION, }<br><br>Plaintiff, }<br><br>v. }<br><br>LGA ENGINEERING AND CONSTRUCTION, INC., CAPITOL INDEMNITY CORPORATION, }<br><br>Defendants. } | CASE NO. CV 00-B-0425-NE |

ENTERED
MAR 2 1 2002

## MEMORANDUM OPINION

The court conducted a bench trial in this case. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the court hereby enters its findings of fact and conclusions of law.

I. **Findings of Fact**

Based upon the evidence presented at trial, the court makes the following findings of fact:

A. *Background*

Defendant LGA Engineering and Construction, Inc. ("LGA"), at all times relevant hereto, was the prime contractor for the United States Corps of Engineers, Contract Number DACA 01-96-C-0114 (the "Contract"). The purpose of the Contract was electrical utility services on Redstone Arsenal, particularly the construction of an electrical substation and related services. LGA was paid in full ($3.5 million dollars) by the government.

Larry Ashbrooks, Sr. ("Ashbrooks, Sr.") is the owner and sole shareholder of LGA. Larry Ashbrooks, Jr. ("Ashbrooks") was the project manager for LGA on the Redstone Arsenal project. LGA is still in existence but not active.

28

Defendant Capitol Indemnity Corporation ("Capitol Indemnity") furnished to the United States a performance and payment bond under the Contract pursuant to the "Miller Act," as codified in 40 U.S.C. § 270a, *et seq.* The Payment Bond is in evidence as Plaintiff's Exhibit (hereafter PX) 1.

LGA and Utility Service Corporation ("Utility Service") entered into a subcontract regarding the Redstone Arsenal project. The subcontract was memorialized by a purchase order which was introduced in evidence as PX 2. The purchase order from defendant LGA Engineering and Construction, Inc. to Utility Service was in the amount of $38,000.00. (Id.).

Defendants LGA and Capitol Indemnity dispute plaintiff's authority to perform additional services beyond the initial scope of its subcontract with LGA. In addition, Capitol Indemnity denies liability under the Miller Act based upon its assertion that the above-styled action was not filed within one year of the last date Utility Service performed labor or supplied materials for the Redstone Arsenal Project.

      B.    *Course of Performance*

Utility Service began its work on the project in mid-March 1998. In addition to the initial scope of electrical testing, Utility Service performed an expanded scope of services on the project at the request of Larry Ashbrooks, Jr.

*Testimony of Alan Peterson*

Alan Peterson ("Peterson") is the president of Utility Service Corporation. He made site visits to the project at least once a week. Daily reports were prepared for work done each day. Utility Service began its field acceptance testing pursuant to the initial contract around March 13, 1998, the date of the purchase order. These testing services continued on the scope of work covered

by the purchase order until March 1999. (*See* e.g. PX 22, 23, 24, 25, 26.) Peterson testified that in the contracting business contracts are changed either by verbal direction or by a formal change order. Peterson testified that Ashbrooks, on behalf of LGA, requested that plaintiff perform work outside of the purchase order. Peterson personally received authorization from Ashbrooks with regard to breakdowns, oil samples, and cable testing at various locations. In addition to the services required under the purchase order, Utility Service performed various construction, testing, and troubleshooting services on LGA's behalf. This work was required of LGA under LGA's Contract with the U. S. Corps of Engineers. These additional services were performed at various times between March, 1998 and November, 1999. (*See* PX 7-20, 22-26, 29.)[1]

All work performed by Utility Service on the Arsenal project was either requested or authorized by Ashbrooks, the project manager for LGA on site. The work performed by Utility Service was necessary for LGA's final completion of the Contract with the U.S. Corps of Engineers. Utility Service submitted invoices to LGA for services rendered on the Arsenal project. LGA has paid certain invoices, but plaintiff claims in this case that there is an outstanding principal balance of $120,479.85. The court found Mr. Peterson to be a truthful and credible witness.

*Testimony of Arnold Pugh*

Arnold Pugh ("Pugh") was in charge of quality control on the Substation 16 Redstone job. Pugh worked for defendant LGA for approximately one year, from July 1997 to July 1998. Pugh was responsible for enforcing government specifications on the project. Pugh testified that he was aware of work performed by the plaintiff on the project that was unrelated to acceptance field testing.

---

[1] For example, Mr. Peterson testified that he had a conversation in late July of 1998 regarding dismantling of the old substation.

According to the Pugh's testimony, which the court found credible, this additional work was directed by Ashbrooks and included:

- Nitrogen gas supplementation for power transformers;
- PCB testing on transformer samples;
- Troubleshooting with electric distribution transfer switches;
- Replacement of lightning arresters and clean switchgear;
- Re-termination of wiring and control cables;
- Installation of fuse blocks;
- Connecting battery banks and charger activation;
- Repairs to circuit switchers;
- Troubleshooting and repair of $SF_6$ gas leak and breaker;
- Replacement of potential transformer;
- Installation of weatherhead, conduit, and service entrance conductors;
- Installation of power supply;
- Repair of SCADA and transfer switch scheme;

All of the above noted work was outside the scope of acceptance field testing. In other words, the work was not covered by the contract between LGA and Utility Service. Pugh testified that this work was necessary to comply with the requirements of LGA's contract with the Corps of Engineers.

Pugh also testified that when he left the project in July 1998 the compacitor banks were not up and running. Testing on the compacitor banks was required under LGA's contract with the Corps of Engineers. Pugh testified that in order for the banks to be tested they needed to be up and running.

*Testimony of Mike Lancaster*

Mike Lancaster ("Lancaster") is a former employee of Utility Service (January 1998 - February 2001) and worked on the Arsenal project as plaintiff's Field Technician. Lancaster was aware that the original scope of the work involved field acceptance testing. Lancaster testified that Ashbrooks and Peterson both authorized him to do work outside the area of field acceptance testing. Ashbrooks was aware that Utility Service was performing this work and did not object. Lancaster testified to several such projects specifically authorized by Ashbrooks. *(See* e.g. PX 9, 10, 11, 12,

4

15, 17, 19, 20.) In addition to the initial field testing work, Utility Service performed various construction, testing, and troubleshooting work on LGA's behalf. As a Field Technician on the project, Lancaster communicated directly with Ashbrooks. Ashbrooks was aware of and authorized all work performed by Utility Service for LGA on the Arsenal project.

*Testimony of Larry Ashbrooks, Jr.*

Ashbrooks was the project manager for LGA and worked until September 1998.[2] Ashbrooks testified that LGA's subcontract with Utility Service included acceptance testing of substation, medium voltage testing on cables, and oil sample testing.

The court is of the opinion that Mr. Ashbrooks gave false testimony under oath on a number of material matters at issue. For example, he testified that if he had asked Utility Service to do work beyond the scope of the contract he would have asked Utility Service for a contract price. The court did not find this testimony credible. The court also finds that Ashbrooks testified untruthfully when he stated that if Utility Service did any work on termination of control cables, it was not authorized by him. Ashbrooks was questioned with regard to PX 22, 23, 24, 25, and 27. He testified that he was not aware that the plaintiff was still working on the site after LGA left the site. The court did not find this testimony credible.

Between March 31, 1998 and November 1999, Utility Service billed LGA for its work on the Redstone Arsenal Project via eighteen invoices in the aggregate amount of $160,378.74. (PX 2-20). LGA received full payment under its contract with the United States Corps of Engineers and forwarded payment to Utility Service on the above-listed invoices in the total amount of $39,898.89. There remains an outstanding balance of $120,479.85. (*See* PX 3).

---

[2] LGA went out of business within three months of that period.

*Interpretation of Subcontract*

As noted above, the purchase order (PX 2) is the only document evidencing the subcontract between plaintiff and defendant LGA. There was a dispute in the testimony regarding the services to be provided under the purchase order. The purchase order, prepared by Renee Nicholas (now Ashbrooks) of LGA, simply described the work to be performed by plaintiff as: "Substation Testing at Redstone Arsenal Repair Electrical Dist. Phase VIII Contract #DA CA 01-96-C-0114." Plaintiff's President, Alan Peterson, said the purchase order was for field acceptance testing on the substation equipment as outlined in a letter to LGA's supplier, Westco. (PX 34). Larry Ashbrooks, Jr. and Larry Ashbrooks, Sr., witnesses for defendant LGA, testified that the purchase order included not only testing of the substation but also medium voltage testing and oil sample testing.

The court finds that plaintiff agreed to provide field acceptance testing on the substation as required by the specifications of the contract between LGA and the Corps of Engineers. The additional work performed by plaintiff was at the request of Ashbrooks on behalf of LGA, and was not encompassed in the $38,000.00 amount set out in the purchase order.

## II. **Conclusions of Law**

### A. *The Miller Act*

The Miller Act establishes a cause of action for breach of contract in favor of subcontractors against a government contractor's payment surety for all "sums justly due." 40 U.S.C. § 270b. Under section 270b (b), a suit under this section must commence within "one year after the day on which the last of the labor was performed or material was supplied." 40 U.S.C. §270b (b). In determining the last day that labor was performed or material supplied, "repairs made on the original project are not taken into consideration." *United States for the Use of Dillon Construction, Inc. v.*

*Continental Insurance Company*, 776 F.2d 962, 964 (11th Cir. 1985).

The Complaint in this case was filed on February 22, 2000. Capitol Indemnity denies liability under the Miller Act based upon its assertion that this action was not filed within one year of the last date Utility Services performed labor or supplied material for the project. The court credits the testimony of plaintiff's witnesses, specifically Alan Peterson, and finds that plaintiff performed labor defined by the Miller Act, within one year of the filing of this lawsuit. (*See* e.g. PX 22, 23, 24, 25, 26, 29.) In addition, this work was authorized by LGA and was necessary to comply with the requirements of LGA's contract with the Corps of Engineers. Therefore, Capitol Indemnity's statute of limitations defense is without merit.

      B.    *Alabama Timely Payments to Contractors and Subcontractors Act*

Section 8-29-1, *et seq.*, of the Code of Alabama addresses a contractor's obligations to make timely payments to its subcontractors. Specifically, section 8-29-2 states in pertinent part: "[performance by a . . ., subcontractor, . . . in accordance with the provision of his or her contract entitles them to payment from the party with whom they contract." ALA. CODE § 8-29-2 (2001). Section 8-29-3 further states as follows:

> (b)    When a subcontractor has performed pursuant to his or her contract and submits an application or pay request for payment or an invoice for materials to a contractor in sufficient time to allow the contractor to include the application, request, or invoice in his or her own pay request submitted to an owner, the contractor shall timely pay to the subcontractor, but if payment terms are not agreed to, then within seven days of receipt of payment from owner by mailing via first class mail or delivering the amount received for the subcontractor's work and materials based on work completed or service provided under the contract.
>
> . . .
>
> (d)    If the contractor, . . . does not make payment in compliance with this chapter, the contractor, . . . shall be obligated to pay his or her . . ., subcontractor, . . . interest at the rate of one percent per month (12 %per annum) on the unpaid balance due.

7

ALA. CODE § 8-29-3 (b), (d) (2001).

    Section 8-29-6 addresses a subcontractor's cause of action under the Act as follows:

> A . . ., subcontractor, . . . may file a civil action solely against the party contractually obligated for the payment of the amount claimed to recover the amount due plus the interest accrued in accordance with this chapter. If the court finds in the civil action that the . . . contractor . . . has not made payment in compliance with this chapter, the court shall award the interest specified in this chapter in addition to the amount due. In any such civil action, the party in whose favor a judgment is rendered shall be entitled to recover payment of reasonable attorneys' fees, court costs and reasonable expenses from the other party.

ALA. CODE § 8-29-6 (2001).

    In this case, LGA received payment for substantial completion of the project within 30 days of "beneficial occupancy," which was July 13, 1998.[3] Pursuant to section 8-29-3(d) of the Act, LGA was thereafter required to submit payment to Utility Service for all unpaid invoices within seven days of its receipt of payment. LGA's failure to make such payment triggers liability under the Act, including pre-judgment interest at twelve percent (12%) per annum.

    C.    *Damages and Interest*

    Mr. Peterson testified that the work reflected in the Daily Reports entered as plaintiff exhibits 27 and 28 was performed after the equipment was transported from the Arsenal to plaintiff's business address. The court is of the opinion that the time spent by plaintiff's employees for the work described in plaintiff's exhibits 27 and 28 is not chargeable to defendant LGA and therefore, neither defendant is required to pay for the time spent by plaintiff's employees on the work reflected in exhibits 27 and 28. Plaintiff's exhibit 55 shows the exact

---

    [3]Ashbrooks testified that with beneficial occupancy, the government has accepted installation but punch list items remain. LGA's final payment under the contract was in August of 1999. Based on the testimony of Alan Peterson and the exhibits, the court finds that plaintiff performed additional labor (not included on the punch list) for LGA through March of 1999.

amount of time spent by plaintiff's employees for the work reflected in the Daily Reports entered as plaintiff's exhibits 27 and 28. Multiplying the hourly rate of pay for each employee times the number of hours worked (as testified to by Allen Peterson) results in a total amount of $1,285.50.[4] The original total principal amount due plaintiff is $120,479.85. Deducting $1,285.50 from the principal amount due plaintiff results in an unpaid balance of $119,194.35.

Utility Service seeks prejudgment interest on its damages. The allowance of prejudgment interest in cases arising under the Miller Act is a matter of federal law. *United States ex rel. Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 677-78 (11th Cir. 1987). Because the Miller Act does not provide any explicit standards for awarding prejudgment interest, the question should be answered by referring to state law. *Id.* at 678.

In general, Alabama law authorizes the imposition of pre-judgment interest on "liquidated damages." Such damages have been defined as those damages which are "ascertained by the judgment in the action or a specific sum of money expressly stipulated by the parties as the amount of damages to be recovered and includes damages which are reasonably ascertainable at the time of breach, measured by a fixed or established external standard or by a standard apparent from documents upon which the plaintiff based [his/her] claim." *United States ex rel. Capps v. Fidelity and Deposit Co. of Maryland*, 875 F. Supp. 803, 810 (M.D. Ala. 1995) (citing *United States Fidelity & Guaranty Co. v. German Auto, Inc.*, 591 So. 2d 841, 843 (Ala. 1991)). Additionally, Alabama law authorizes the imposition of pre-judgment interest upon those damages which are: (1) capable of being ascertained by mere computation; or (2) complete at a particular time and can be determined as of such time in accordance with the rules of evidence

---

[4] Defendants do not contest this calculation.

9

and known standards of value. *United States ex rel. Roper, IBG, A division of Roper Corporation v. A.J. Reisz*, 718 F.2d 1004, 1007 (11th Cir. 1983).

The damages awarded to plaintiff in this action are subject to pre-judgment interest under Alabama law. Said damages qualify as "liquidated" damages in that: (1) they have been ascertained by the court; (2) they are ascertainable as of the time of defendant LGA's breach of its obligation to pay invoices for services performed by Utility Service on the Redstone Arsenal project; and (3) they are measured by fixed hourly standards and are well supported by documentation admitted into evidence by Utility Service. Furthermore, said damages have proven to be ascertainable by mere calculation and were complete at the times indicated within the exhibits submitted to this court in this action. As a consequence, defendants LGA and Capitol are both liable to Utility Service for pre-judgment interest on the principal amount of this court's judgment.[5]

At the trial of this matter, the parties presented evidence regarding the following issues: (1) the scope of the initial purchase order between LGA and Utility Service; (2) authorization and necessity of additional work performed by Utility Service on LGA's behalf; (3) the specific services rendered by Utility Service to support the charges submitted by invoice to LGA for payment; (4) LGA's receipt of full payment by the U.S. Corps of Engineers on the Arsenal Project; (5) LGA's payment history to Utility Service regarding the Arsenal Project; and (6) the date that Utility Service last performed labor on LGA's behalf with regard to the Arsenal Project.

---

[5] Defendants argue in their post trial brief that pre-judgment interest should be denied because "[t]he amount payable to the plaintiff was totally disputed from the commencement of this dispute, and was not a sum certain until judgment was rendered." If this argument was accepted, there would be few, if any, cases where prejudgment interest would be allowed.

On March 14, 2002, plaintiff's counsel sent the court a calculation of interest accruing on each invoice on the principal amount. The interest accrues beginning 30 days after the submission of each invoice. Plaintiff's calculation of the prejudgment interest through March 18, 2002, is attached to this opinion as Exhibit A. It reflects prejudgment interest through March 18, 2002, in the amount of $46,503.88.[6] Per diem interest accruing after March 18, 2002, is $39.19, yielding a prejudgment interest amount as of the date of entry of this judgment to $46,621.45.

E.   *Attorneys' Fees*

Utility Service also requests compensation in the form of attorneys' fees. The court has determined that both defendants are liable for the reasonable attorneys' fees and expenses incurred by plaintiff's counsel.

*Defendant LGA*

Under the Alabama Timely Payments to Contractors and Subcontractors Act, the prevailing party, is entitled "to recover payment for attorneys' fees, court costs, and reasonable expenses." Ala. Code § 8-29-6 (1975 as amended). LGA is liable to Utility Service for such fees and expenses under the Act.

*Defendant Capitol*

Although the Miller Act is silent on the issue, "[t]he federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation." *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129

---

[6]Although defendants' counsel does not agree with the court's decision in favor of plaintiff, counsel for defendants has informed the court in a conference call with plaintiff's counsel that he does not challenge the correctness of the prejudgment interest calculated by plaintiff's counsel.

11

(1974). Attorneys' fees may be awarded in a federal cause of action if provided by contract or authorized by federal statute. *Id.* at 126. Additionally, courts have the power to assess attorneys' fees when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Id.* at 129. When a party defends an action through a colorless defense, that constitutes bad faith which is grounds for an award of attorneys' fees.

Having considered the documentary evidence and the testimony and veracity of the various witnesses, the court finds that LGA and Capital Indemnity did assert a "colorless defense" to Utility Service's claims. LGA's superintendent, Larry Ashbrooks, Jr., knew that the invoices LGA was refusing to pay were for work performed by Utility Service that had been specifically authorized by him. As noted above, the court is of the firm opinion that Ashbrooks testified falsely on this important fact. The court finds that LGA raised lack of authorization for the work in bad faith as part of its litigation strategy. Therefore, LGA and its surety, Capitol Indemnity Corporation, are responsible for LGA's reasonable attorneys' fees. In a recent conference call with counsel the court instructed plaintiff's counsel to share plaintiff's statement of attorneys' fees incurred with defense counsel in the interest of reaching an accord thereon. By letter to defendants' counsel dated March 5, 2002, plaintiff's counsel stated plaintiff had incurred total attorneys' fees of $30,998.25 and expenses of $1,000.81. Defendants' counsel informed the court in a second conference call that defendants do not object to the reasonableness of the amount of fees and expenses sought by plaintiff's counsel.[7]

---

[7] Agreement by defendants' attorneys to a reasonable attorneys' fee for plaintiff's counsel does not constitute a waiver by defendants of the right to appeal the awarding of such fees.

## CONCLUSION

In accordance with the foregoing, the court is of the opinion that judgment should be entered in favor of the plaintiff and against defendants in the amount of $119,194.35, plus prejudgment interest in the amount of $46,621.45, attorneys' fees in the amount of $30,998.25 and expenses of $1,000.81. A Judgment will be entered contemporaneously with this Opinion.

**DONE** this 21st day of March, 2002.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge

13

```
UTILITY SERVICE CORP                    ************************
P. O. BOX 1471                          ***                  ***
HUNTSVILLE, AL  35807                   ***  S T A T E M E N T  ***
                                        ***                  ***
TELEPHONE 256-837-8400                  ************************
FAX 256-837-8403                        STATEMENT DATE:  3/18/02
```

LGA ENGINEERING AND CONSTRUCTION, INC.

| INVOICE | INVOICE DATE | INVOICE AMOUNT | ASSIGNED DAY NUMBER** | NUMBER OF DAYS TO 3-18-02 | DAILY INTEREST @ 12% | TOTAL INTEREST TO 3-18-02 |
|---|---|---|---|---|---|---|
| 98074-1 | 6/30/98 | *$22,052.32 | 0 | 1327 | 7.250078 | 9620.85 |
| 98083-1 | 7/10/98 | $3,160.00 | 10 | 1317 | 1.038904 | 1368.24 |
| 98092-1 | 7/31/98 | $6,700.70 | 31 | 1296 | 2.202970 | 2855.05 |
| 98100-1 | 8/12/98 | $504.20 | 43 | 1284 | 0.165764 | 212.84 |
| 98090-1 | 8/13/98 | $2,112.90 | 44 | 1283 | 0.694652 | 891.24 |
| 98105-1 | 8/24/98 | $560.00 | 55 | 1272 | 0.184110 | 234.19 |
| 98042-3 | 8/31/98 | $7,600.00 | 62 | 1265 | 2.498630 | 3160.77 |
| 98092-2 | 8/31/98 | $9,222.37 | 62 | 1265 | 3.032012 | 3835.50 |
| 98104-1 | 10/6/98 | $5,475.01 | 98 | 1229 | 1.800003 | 2212.20 |
| 98030-1 | 10/30/98 | $14,573.79 | 122 | 1205 | 4.791383 | 5773.62 |
| 98042-X-1 | 1/31/99 | $9,434.18 | 214 | 1113 | 3.101648 | 3452.13 |
| 98042-X-2 | 4/2/99 | $35,461.28 | 275 | 1052 | 11.658503 | 12264.75 |
| 98042-X-3 | 11/30/99 | $2,337.60 | 517 | 810 | 0.768526 | 622.51 |
| Totals | | $119,194.35 | | | 39.187184 | 46503.88 |

*Revised amount per Court - Original Amount $120,479.85 less $1285.50

**Day number 0 is July 30, 1998.

Interest calculated daily starting 30 days from invoiced date.
Interest calculations: Invoice amount x 12% interest / 365 = daily interest amount
per day x interest days = total interest due through March 18, 2002.

Daily interest accruing after March 18, 2002 is $39.19 per day.

Exhibit A    CV 00-B-0425-NE
             3/21/02 Memo Opinion